# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO. 5:06 CR 134** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ROBERT E. DAVIS, et al.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| **DEFENDANTS** | ) | |

This matter is before the Court upon Robert Davis's Motion in Limine to Preclude Argument that Salary Paid to Firestone Park Athletic Ass'n Employees was Prohibited Income, see (Dkt. # 38), and Motion of Defendant, Kurt Keller, Motion in Limine to Preclude Argument that Salary Paid to Firestone Park Athletic Ass'n Employees was Prohibited Income, see (Dkt. # 40).

**I.    BACKGROUND**

The Grand Jury of the United States District Court for the Northern District of Ohio issued an Indictment on March 21, 2006 charging Robert E. Davis, Richard A. Keller, Kurt A. Keller, Tracie L. Gamble, and Milly M. Folk with conducting "an illegal gambling business in violation of 18 U.S.C. § 1955 and 2. See (Dkt. # 1). While the record presently before the Court does not provide insight as to the specific facts giving rise to the Indictment, it appears that defendants were employees of Firestone Park Athletic Association

-1-

("Firestone"), an exempt charitable organization organized under Section 501(c)(3) of the Internal Revenue Code.  See (Dkt. # 38 at 1-2); (Dkt. # 40 at 1).

Firestone conducted gambling operations in order to raise funds for youth sports.  See generally, Firestone Park Athletic Ass'n v. Ohio, 217 F.Supp. 2d 833, 834 (N.D. OH 2002).  Consequently, it placed electronic game machines (known as "Treasure Quest" and "Pot-O-Gold") in taverns and instant bingo locations throughout Northeastern Ohio.  Id. at 834-35.  Patrons could play these games and have a chance at winning a prize.[1]  Id. at 835.

On or about February 11, 2002, a search warrant was issued to search for and seize the electronic game machines and related bingo paraphernalia.  See (Dkt. # 36).  A task force comprised of officers from the Summit County Sheriff's Department, the Akron Police Department, and the Lake County Sheriff's Department executed the warrant at nine locations and seized *inter alia* eleven Pot-O-Gold machines, three Treasure Quest machines, bingo paraphernalia (paper instant bingo and pull-tab tickets), and United States currency.  See (Dkt. # 1 at 2-3); Firestone, 217 F.Supp. 2d at 835.

---

[1] This Court previously has observed the following:

> A "pull-tab" game, in traditional form, is essentially a small two-ply paper card, similar to an instant lottery ticket, which bears symbols and patterns that appear when a player peals off the top layer of paper. [V]ideo gaming machines [are] designed to depict an electronic/video version of the paper pull-tab instant bingo tickets.  The electronic pull-tab tickets are sold from large finite pools known as "deals", with each deal containing a fixed number of winners and losers.
> To operate the Treasure Quest pull-tab game, money is inserted into the video machine and used to obtain credits.  Each credit is good for one video pull-tab ticket.  Once a player has finished playing, he can "cash out" by asking the machine to print out a receipt listing his remaining or earned credits.

United States v. Chester Simons, et al., 5:02CR504 (N.D. OH.) (Dkt. # 183 at 2-3) (internal citations omitted).

The Indictment ensued.

## II. LAW AND ANALYSIS

Individual defendants, Robert E. Davis and Kurt A. Keller, have filed the present motions in limine seeking to preclude "the Government from arguing during trial that the salar[ies] paid to [them] and other employees by [Firestone] violates the provisions of Ohio RC 2915.02 (D)(2)."  (Dkt. # 38 at 1.)  The gravamen of the motions is that Firestone obtained funds from the gaming operations and thereafter lawfully utilized those funds to pay ordinary and necessary expenses – namely, the defendants' salaries.

Title 18 U.S.C. § 1955 prohibits illegal gambling businesses by providing that "[w]hoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined or imprisoned for not more than five years or both."  18 U.S.C. § 1955.  Section 1955(b) provides as follows:

>As used in this section-
>  (1) "Illegal Gambling Business" means a gambling business which-
>      (i) is a violation of the law of the State or political subdivision in which it is conducted;
>      (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or a part of such business;
>      (iii) has been or remains in substantially continuous operation for a period in excess of thirty (30) days or has gross revenues of $2000.00 in any single day.
>  (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
>
>  (3) "State" means any State of the United

-3-

> States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

18 U.S.C. § 1955(b).

To establish the first element of the 18 U.S.C. § 1955 violation alleged in the present case, the Government must demonstrate that the defendants' gambling activities violated Chapter 2915 of the Ohio Revised Code. Ohio Revised Code section 2915.02 provides, in pertinent part:

> (A) No person shall do any of the following:
> \* \* \* \* \*
> (2) Establish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance.
> \* \* \* \* \*
> (5) With purpose to violate (A)(1), (2), (3), or (4) of this section, and acquire, possess, control, or operate any gambling device . . . .
>
> \* \* \* \* \*
> (B) For purposes of division . . . (A)(2) of this section, a person facilitates a game of chance conducted for profit or scheme of chance if the person in any way knowingly aids in the conduct or operation of any such scheme or game, including, without limitation, playing any such game or scheme.

OHIO REV. CODE § 2915.02.[2] While Ohio prohibits gambling for profit, the legislature has created a limited exception for charitable gambling. Ohio Revised Code section

---

[2] Chapter 2915 was amended in 2003. The Court has analyzed the former version and determines that no ex post facto concerns are at issue for the purpose of the resolving the present motions. The Court, therefore, shall refer to the present version of Chapter 2915 throughout this order.

-4-

2915.02(D)(1) allows charitable organizations with certain federal income tax exemptions to conduct "games of chance" for profit provided that the "all of the money or assets received from the games of chance, after deduction only of prizes paid out during the conduct of the games of chance are used by, or given, donated, or otherwise transferred" to charitable organizations or tax exempt organizations as defined by the Internal Revenue Code.[3] Under the exemption, "[n]o person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any game of chance." OHIO REV. CODE § 2915.02 (D).

---

[3]The Ohio Revised Code distinguishes between a "scheme of chance" and a "game of chance"as follows:

> (C)  "Scheme of chance" means a lottery, numbers game, pool or other scheme in which the participant gives a valuable consideration for a chance to win the prize.
>
> (D)  "Game of chance" means poker, craps, roulette, a slot machine, a punch board, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely or wholly by chance.
>
> (E)  "Scheme or game of chance conducted for profit" means any scheme or game of chance designed to produce income for the person who conducts or operates the scheme or game of chance, but does not include a charitable bingo game.

OHIO REV. CODE § 2915.01. This Court previously has determined that the video gaming machines at issue are "games of chance", see United States v. Chester Simons, et al., 5:02CR504 (N.D.OH. 2002) (Dkt. # 183) – a decision that was affirmed by the United States Court of Appeals for the Sixth Circuit, United States v. Simons, 150 Fed. Appx.428, 438 (6th Cir. 2005).

Again, while the record remain opaque at this stage of the criminal proceedings, it appears that the defendants intend to rely upon Firestone's status as an exempt charitable organization to affirmatively defend against the 18 U.S.C. §1955 violation charged in the Indictment.[4] Cases addressing the contours of Ohio's charitable gambling exemption are legion, particularly since the Supreme Court of Ohio's decision in Freedom Rd. Found. v. Ohio Dept. of Liquor Control, 80 Ohio St. 3d 202, 1997 Ohio 346, 685 N.E.2d 522 (1997).

In Freedom Rd. Found., the court found that in the context of Ohio Revised Code section 2915.02, the words "conduct" and "operate" held different meanings. Specifically, the court examined Ohio Revised Code section 2915.01(T) which defined the term "conduct" as "to back, promote, organize, manage, carry on, or prepare for the operation of a scheme or game of chance but does not include any act performed by a bingo game operator." The court concluded that, because the verbs above are listed in the disjunctive, a charitable organization conducts the scheme or game of chance when it executes any of the listed actions. See Freedom Rd. Found., 80 Ohio St. 3d at 204-05. The court then examined the term "operate" and noted as that the word "connotes performance of an activity, while the verbs used to define 'conduct' would allow a charitable organization to delegate operation of the activity, while retaining a supervisory or organizational role." Freedom Rd. Found., 80 Ohio St. 3d at 205 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) 1580-1581). The Freedom Rd. Found. court ultimately held that bars and other liquor-permit-holding premises could operate charitable gambling as long as neither the owners nor

---

[4]There lacks any allegation at the present time that Firestone is a "sham" charity.

the employees were compensated for their participation. As one Ohio appellate court has observed, "[t]his ruling opened the floodgates for a large volume of untapped charitable opportunities, as well as an equally large opportunity for abuse." Ohio v. George, 2004 Ohio 2868 ¶ 5 (1st App. Dist., Hamilton County).

The litigation, churned up in the wake of Freedom Rd. Found., addressed what gambling proceeds, if any, an operator may utilize to address expenses such as rent and repairs. See, e.g., FOE Aerie 3998 v. Liquor Control Comm'n, 2004 Ohio 3308 (10th App. Dist., Franklin County) (addressing whether expenses for payroll and building improvements were reasonable); Ohio v. Rose, 2004 Ohio 7000 (1st App. Dist., Hamilton County) (addressing whether instant bingo store's expenses for rent and utilities, deducted prior to delivering profits to a church, were reasonable). The defendants in the present case employ a new approach. The defendants divert attention from the operators and focus it on the charitable organization that "conducted" the games of chance – namely, Firestone. The defendants assert that Firestone's payment of salaries with gambling proceeds complies with Ohio's charitable gambling exemption and the Internal Revenue Code.

The plain language of Ohio's gambling statute is silent as to the nature and scope of expenses that may be paid by a charitable organization with gambling proceeds. While Ohio Revised Code section 2915.02(D) provides that "[n]o person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any game of chance", OHIO REV. CODE § 2915.02 (D), the statutory language expressly refers to operators. As discussed *supra*, the Freedom Rd. Found. court reasoned that operators were the tavern owners and

-7-

employees, as opposed to the charity that "conducts" the gambling operation. The instant defendants recite <u>Freedom Rd. Found.</u> and, without any explanation as to their reasoning, suggest that "[a] 501(c)(3) organization may conduct and use it's [sic] funds to do so (including pay salaries to it's [sic] employees) and if it delegates the operation of the scheme of chance (which is the present case) to non-employees, it cannot pay these operators." (Dkt. # 38 at 3.)

The defendants appear to invoke the ancient maxim of "expressio unius est exclusio alterius," that where "the persons and things to which [a statute] refers are designated, there is an inference that all omissions should be understood as exclusions." 2A NORMAN J. SINGER, SUTHERLAND'S STATUTORY CONSTRUCTION 47.23, at 304-05 (6th ed. 2001). Thus, the defendants seemingly argue that the inclusion of "operators" in , and the concomitant omission of organizations that "conduct" gambling operations (i.e., charities) from, the provision prohibiting employees from receiving compensation derived out of gambling proceeds necessarily reflects the Ohio General Assembly's intent to permit employees of charitable operations to receive a salary. Setting aside the inferential leaps required to arrive at the defendants' interpretation, the Court observes that this cannon of statutory construction has been long rejected by the courts. <u>See, e.g.</u>, <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 387 n.23 (1983) (rejecting application of the expressio unius maxim because such a presumption would undermine the purpose of the 1933 Securities Act); <u>National Petroleum Refiners Ass'n v. FTC</u>, 482 F.2d 672, 676 (D.C. Cir. 1973) (stating that the "[expressio unius] maxim is increasingly considered unreliable"); <u>cf.</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 78 & n.11 (1984) (applying the expressio unius theory only where the Court found

-8-

a detailed, carefully considered list of exemptions, from which one item was notably absent). This Court likewise rejects the defendants' invitation to invoke the maxim.

Nevertheless, the Court's exhaustive search of authority addressing Chapter 2915 has provided limited insight as to the impact of the charitable gambling exemption on the internal operations of the charitable organization. As discussed *supra*, a substantial number of courts have interpreted the exemption to prohibit charities from providing those that operate the gambling operation – generally, owners and employees of non-charitable organizations – with any salary beyond reasonable actual expenses such as rents or repairs. One Ohio appellate court has observed that the charitable gambling exemption prohibits "anyone" from deriving a profit or compensation. See Ohio v. Fuchs, 92 Ohio App. 3d 15, 17, 633 N.E.2d 1210 (12 App. Dist., Butler County 1993). However, these cases merely reflect Ohio's historical hostility toward gambling. See generally, Mills-Jennings, Inc. v. Dept. of Liquor Control, 70 Ohio St. 2d 95, 435 N.E.2d 407 (1982) (discussing in great detail Ohio's history in addressing lotteries, bingo and gambling).

Without the guidance of applicable precedent, this Court finds that the most reasonable statutory construction of the charitable gambling exemption is that the Ohio General Assembly deemed existing limitations on charitable and tax-exempt organizations – for example, those provided in the Internal Revenue Code – as sufficient sources to govern the conduct of those organizations receiving gambling proceeds. This appears to be the defendants' view as well. The defendants suggest that pursuant to relevant federal law, "a 501 (c)(3) organization can pay its employees to raise funds." (Dkt. # 38 at 2.) While it is uncontroverted that federal law authorizes a tax-exempt organization to utilize funds to pay

-9-

ordinary and necessary business expenses such as employee salaries, said laws also proscribe these organizations from utilizing gambling proceeds for anything other than actual expenses. The federal charitable gambling exemption, codified at title 18 U.S.C. § 1955 (e) provides:

> This section [criminalizing gambling] shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended [26 USCS § 501(c)(3)], if ***no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.***

18 U.S.C. § 1955 (e) (emphasis added). Consequently, federal law prohibits a charitable or tax-exempt organization from utilizing gambling proceeds to provide the organization's employees with salaries.

Otherwise stated, the Ohio General Assembly has authorized only those organizations described as charities or tax-exempt by various sections of federal law – specifically, provisions of the Internal Revenue Code – to conduct gambling operations and receive gambling proceeds. See OHIO REV. CODE § 2915.02 (D)(1)(b) ("The games of chance are conducted by a charitable organization that is, and has received from the internal revenue service a determination letter that is currently in effect, stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code."); OHIO REV. CODE § 2915.02 (D)(1)(d) ("All of the money or assets received from the games of chance . . . are used by, or given, donated, or otherwise transferred to, any organization that is described in subsection 509(a)(1), 509(a)(2), or 509(a)(3) and is either a governmental unit or an organization that is tax exempt under

subsection 501(a) and described in subsection 501(c) (3) of the Internal Revenue Code."). The Ohio General Assembly did not prescribe rules for the internal governance and operation of those charitable and tax-exempt organizations – indeed, it left that responsibility to existing federal law. For example, the Ohio statute requires that the organization possess a determination letter from the Internal Revenue Service therein verifying that it is exempt from federal taxation, as determined by federal law, when conducting games of chance. See OHIO REV. CODE § 2915.02 (D)(1)(b). Federal law meanwhile provides that a charitable organization is prohibited from providing any compensation beyond actual expenses to its employees that is derived from gambling proceeds. See 18 U.S.C. § 1955 (e). Consequently, charitable and tax-exempt organizations that conduct gambling operations pursuant to Ohio's charitable gambling exemption are otherwise prohibited by 18 U.S.C. § 1955 (e) from utilizing the gambling proceeds to provide any benefit, including salaries, to a "private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity."

As the moving defendants concede in their motion that they "were paid a weekly salary, by check from the [Firestone] payroll checking account" and said account held funds "acquired mainly by deposits from it's [sic] various instant bingo stores", there lacks any rationale to preclude the Government from arguing during trial that the defendants' salaries were illegal for the reasons stated herein.

Accordingly, Robert Davis's Motion in Limine to Preclude Argument that Salary Paid to Firestone Park Athletic Ass'n Employees was Prohibited Income, see (Dkt. # 38), and Motion of Defendant, Kurt Keller, Motion in Limine to Preclude Argument that Salary Paid

-12-

to Firestone Park Athletic Ass'n Employees was Prohibited Income, see (Dkt. # 40), are

**DENIED.**


   **IT IS SO ORDERED**.

               **s/ Peter  C. Economus - August 4, 2006**
               **PETER C. ECONOMUS**
               **UNITED STATES DISTRICT JUDGE**